Approved: _____
           SAMSON ENZER
           Assistant United States Attorney

Before:   HONORABLE SARAH L. CAVE
           United States Magistrate Judge
           Southern District of New York

# 20 MAG 9076

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA      :

      - v. -               :

SHAMOON RAFIQ,           :
    a/k/a "Shamoon Omer Rafiq,"
    a/k/a "Omar Rafiq,"      :
    a/k/a "Omer Rafiq,"

                :
         Defendant.
                :

- - - - - - - - - - - - - - - - - - x

**SEALED COMPLAINT**

Violations of 15 U.S.C. §§
78j(b) and 78ff; 17 C.F.R.
§ 240.10b-5; 18 U.S.C. §§
2, 1028A, and 1343.

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

    JOSE L. MENA, being duly sworn, deposes and states that he is
a Postal Inspector with the United States Postal Inspection Service
("USPIS") and a member of a law enforcement task force (the "HSI
Task Force") led by the United States Department of Homeland
Security, Homeland Security Investigations ("HSI"), and charges as
follows:

## COUNT ONE
### (Securities Fraud)

### BACKGROUND

    1.   The persons referred to as "Victim-1" and "Victim-2" in
this Complaint are members of a prominent billionaire family (the
"Family").

    2.   More than five years ago, Victim-1 and another Family
member co-founded a limited liability partnership in Europe that
is referred to in this Complaint as "FamCap."  FamCap is a family
office investment firm that manages and invests assets of members
of the Family.  Victim-1 is the chief executive officer ("CEO") of

FamCap, and Victim-2 is a partner of FamCap. FamCap has an official website that was created more than four years ago (the "Official FamCap Website"). Victim-1 and Victim-2 have official FamCap email addresses (the "Official FamCap Victim-1 Email Address," and "Official FamCap Victim-2 Email Address," respectively) (collectively, the "Official FamCap Email Addresses").

3.      SHAMOON RAFIQ, a/k/a "Shamoon Omer Rafiq," a/k/a "Omar Rafiq," a/k/a "Omer Rafiq," the defendant, was born in the Netherlands in or about 1973 and presently resides in Singapore. RAFIQ was convicted in 2004 in the United States District Court for the Eastern District of New York for committing a wire fraud scheme in which he purported to sell stock in a privately held company that had not yet conducted its initial public offering ("pre-IPO stock") when, in fact, RAFIQ did not own or have access to such stock.

4.      Since at least in or about July 2020, SHAMOON RAFIQ, a/k/a "Shamoon Omer Rafiq," a/k/a "Omar Rafiq," a/k/a "Omer Rafiq," the defendant, has been engaging in a new scheme to defraud victims into paying him millions of dollars for alleged investment interests in various pre-IPO stocks that he does not actually own or control.

5.      In connection with his new fraud scheme, SHAMOON RAFIQ, a/k/a "Shamoon Omer Rafiq," a/k/a "Omar Rafiq," a/k/a "Omer Rafiq," the defendant, caused the creation in or about July 2020 of a fake FamCap website (the "Fake FamCap Website") that has automatically routed users to the Official FamCap Website, and fake FamCap email addresses for Victim-1 and Victim-2 that closely resemble, but are slightly different from, their Official FamCap Email Addresses (the "Fake FamCap Victim-1 Email Address" and "Fake FamCap Victim-2 Email Address," respectively) (collectively, the "Fake FamCap Email Addresses"). The Fake FamCap Website and Fake FamCap Email Addresses for Victim-1 and Victim-2 were created without their or FamCap's consent. The Fake FamCap Email Addresses also included the names of Victim-1 and Victim-2 without their authorization.

6.      In or about July 2020, SHAMOON RAFIQ, a/k/a "Shamoon Omer Rafiq," a/k/a "Omar Rafiq," a/k/a "Omer Rafiq," the defendant, began soliciting millions of dollars from investment firms in New York and elsewhere based on fraudulent misrepresentations that he owned investments in pre-IPO stock through an alleged FamCap-managed fund called "[Fam] Capital Technology Fund, LLC" (the "LLC") and wanted to sell his alleged LLC membership interests. In reality, the LLC never existed.

7.   For example, as part of this fraudulent scheme, SHAMOON RAFIQ, a/k/a "Shamoon Omer Rafiq," a/k/a "Omar Rafiq," a/k/a "Omer Rafiq," the defendant, began soliciting millions of dollars in or about July 2020 for such alleged investment interests from a boutique investment firm based in New York, New York (the "New York Firm") and one of the firm's institutional clients based in South America (the "Client").

8.   In the course of communications from on or about July 21, 2020 through on or about August 13, 2020, SHAMOON RAFIQ, a/k/a "Shamoon Omer Rafiq," a/k/a "Omar Rafiq," a/k/a "Omer Rafiq," the defendant, made a variety of false representations to dupe the New York Firm and the Client into agreeing to pay RAFIQ millions of dollars for alleged investment interests in shares of pre-IPO stock in Airbnb, Inc. ("Airbnb") that he supposedly owned or controlled through the purported FamCap-managed LLC (the "Alleged Airbnb Transaction"). For example, RAFIQ falsely claimed that he was a close friend of Victim-1 of FamCap; RAFIQ falsely claimed that in or about 2015, he had invested about $2.5 million in the LLC, which he falsely claimed was used to acquire series C shares of pre-IPO stock in Airbnb for about $11 per share; RAFIQ falsely claimed he was looking to sell all or part of his interests in the LLC that held those Airbnb shares, which had since increased in value to more than $80 per share; and RAFIQ falsely claimed that although the Family would have to be involved in any sale of his LLC interests in light of FamCap's role as manager of the LLC, the Family would consent and be cooperative in facilitating any such transaction as long as the buyer was reputable. In fact, Victim-1 and Victim-2 do not know RAFIQ; FamCap never created or managed the LLC, which never existed; and RAFIQ never owned or controlled any investment interests in FamCap or in any investment funds managed by FamCap.

9.   On or about August 5, 2020, during an exchange of emails with the New York Firm and the Client concerning the Alleged Airbnb Transaction, SHAMOON RAFIQ, a/k/a "Shamoon Omer Rafiq," a/k/a "Omar Rafiq," a/k/a "Omer Rafiq," the defendant, copied into the email chain the Fake FamCap Email Addresses to create the false impression that FamCap was involved in and approved of the Alleged Airbnb Transaction.

10.  From on or about August 10 through 14, 2020, SHAMOON RAFIQ, a/k/a "Shamoon Omer Rafiq," a/k/a "Omar Rafiq," a/k/a "Omer Rafiq," the defendant, exchanged communications with the New York Firm and its Client through which he deceived the Client into

agreeing to pay him about $9 million for alleged LLC interests that did not actually exist.

11.    From on or about August 10 through 14, 2020, SHAMOON RAFIQ, a/k/a "Shamoon Omer Rafiq," a/k/a "Omar Rafiq," a/k/a "Omer Rafiq," the defendant, exchanged communications with the New York Firm and the Client through which he requested that the Client wire the $9 million in funds for the Alleged Airbnb transaction to a bank account in Singapore registered to an individual who is not named in this Complaint ("Individual-1").

12.    On or about August 13, 2020, SHAMOON RAFIQ, a/k/a "Shamoon Omer Rafiq," a/k/a "Omar Rafiq," a/k/a "Omer Rafiq," the defendant, sent an email to the New York Firm and the Client as well as the Fake FamCap Email Addresses laying out a proposed escrow procedure to effectuate the $9 million wire transfer to Individual-1's bank account in Singapore (the "Individual-1 Bank Account").

13.    On or about August 13, 2020, SHAMOON RAFIQ, a/k/a "Shamoon Omer Rafiq," a/k/a "Omar Rafiq," a/k/a "Omer Rafiq," the defendant, caused a fake reply email impersonating Victim-2 to be sent from the Fake FamCap Victim-2 Email Address to the New York Firm and the Client purporting to concur with RAFIQ's escrow proposal.

14.    Through fraudulent misrepresentations and omissions to the New York Firm and its Client made by SHAMOON RAFIQ, a/k/a "Shamoon Omer Rafiq," a/k/a "Omar Rafiq," a/k/a "Omer Rafiq," the defendant, RAFIQ caused the Client to wire about $9 million into an escrow account in New York, New York on or about August 14, 2020 (the "Escrow Account") for anticipated transmission to the Individual-1 Bank Account.

## STATUTORY ALLEGATIONS

15.    The allegations contained in paragraphs 1 through 14 of this Complaint are repeated and realleged as if fully set forth herein.

16.    From at least in or about July 2020 through the date of this Complaint, in the Southern District of New York and elsewhere, SHAMOON RAFIQ, a/k/a "Shamoon Omer Rafiq," a/k/a "Omar Rafiq," a/k/a "Omer Rafiq," the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, used and employed manipulative and deceptive devices and contrivances in connection

with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, to wit, RAFIQ solicited millions of dollars from victims based on fraudulent misrepresentations and omissions conveying the false impression that if they paid him those funds, RAFIQ would sell them alleged investment interests in the LLC, which was fictitious.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT TWO
### (Wire Fraud)

17.   The allegations contained in paragraphs 1 through 14 of this Complaint are repeated and realleged as if fully set forth herein.

18.   From at least in or about July 2020 through the date of this Complaint, in the Southern District of New York and elsewhere, SHAMOON RAFIQ, a/k/a "Shamoon Omer Rafiq," a/k/a "Omar Rafiq," a/k/a "Omer Rafiq," the defendant, willfully and knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, RAFIQ made fraudulent misrepresentations and omissions by means of email communications, cellphone communications and other wire communications as part of a scheme to deceive victims into paying RAFIQ millions of dollars for alleged investment interests in the fictitious LLC.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Aggravated Identity Theft)

19.    The allegations contained in paragraphs 1 through 14 of this Complaint are repeated and realleged as if fully set forth herein.

20.    From at least in or about July 2020 through the date of this Complaint, in the Southern District of New York and elsewhere, SHAMOON RAFIQ, a/k/a "Shamoon Omer Rafiq," a/k/a "Omar Rafiq," a/k/a "Omer Rafiq," the defendant, knowingly did transfer, possess, and use, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, RAFIQ caused the Fake FamCap Email Addresses to be created bearing the names of Victim-1 and Victim-2 without their approval, caused emails to be sent in their names from the Fake FamCap Email Addresses without their approval, and caused their names and signatures to be used on fake deal documents relating to the Alleged Airbnb Transaction without their approval during and in relation to the wire fraud offense charged in Count Two of this Complaint.

(Title 18, United States Code, Sections 1028A and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

21.    I have been a Postal Inspector with USPIS for approximately five years.  I am currently assigned to the federal HSI Task Force, which is focused on investigating and disrupting complex financial crimes including securities frauds, wire frauds, cyber money laundering and other white-collar crimes.  The HSI Task Force is comprised of (among others) federal agents, state and local police investigators and intelligence analysts from multiple law enforcement agencies in New York including HSI, USPIS and the New York City Police Department.  During my tenure as a federal law enforcement agent both on the HSI Task Force and with USPIS, I have participated in investigations of frauds, cybercrimes involving money laundering, and other white-collar crimes, investigations of a wide variety of crimes that were perpetrated through the use of computers, emails and other forms of electronic communications and the internet, and I have received training regarding the foregoing matters.

22.    I am one of the HSI Task Force members with primary responsibility for the investigation of this case.  The information

contained in this Complaint is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources and agents, documents provided by investment firms and others, and my examination of reports and records.  Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.  Where dates, figures, and calculations are set forth herein, they are approximate.

## OVERVIEW OF THE SCHEME TO DEFRAUD

23.  Based on the facts set forth below, I respectfully submit that there is probable cause to believe that SHAMOON RAFIQ, a/k/a "Shamoon Omer Rafiq," a/k/a "Omar Rafiq," a/k/a "Omer Rafiq," the defendant, has solicited millions of dollars through the use of false representations offering to sell purported investments in pre-IPO stock that he did not actually own; false claims that these fake investments were held in a purported FamCap-managed LLC that did not actually exist; and emails from fake email accounts and fake deal documents falsely impersonating two senior FamCap officials (namely, Victim-1 and Victim-2) to create the false impression that his alleged sale offers were legitimate when, in reality, they were not.  Specifically, the facts set forth below establish probable cause to believe the following:

a.  In or about 2004, RAFIQ was convicted in the United States District Court for the Eastern District of New York for committing a wire fraud scheme involving pre-IPO stock.  For this crime, RAFIQ was sentenced to 41 months of imprisonment.  RAFIQ was subsequently deported from the United States and eventually relocated to Singapore.

b.  Since at least in or about July 2020, RAFIQ has been engaged in a new scheme relating to pre-IPO stock investments. In this new scheme, RAFIQ has solicited millions of dollars from investment firms based on false claims that in exchange for their funds, he would sell them investment interests in a purported special purpose investment vehicle called "[Fam] Capital Technology Fund, LLC" that was supposedly managed by FamCap and allegedly owned pre-IPO stock in Airbnb, among other companies.

c.  For example, RAFIQ deceived the New York Firm and the Client into making agreements under which the Client wired

about $9 million on or about August 14, 2020 into the Escrow Account in New York, New York for anticipated release to the Individual-1 Bank Account in Singapore, to pay RAFIQ for his purported sale of investment interests in the LLC. In soliciting this $9 million investment, RAFIQ made a variety of false representations, including the following:

       i. RAFIQ falsely claimed that the LLC was managed by FamCap. In fact, the LLC never existed.

       ii. RAFIQ falsely claimed that the LLC owned pre-IPO shares of Airbnb. In fact, the LLC did not own and could not have owned such stock because the LLC never existed.

       iii. RAFIQ falsely claimed that Victim-1 and Victim-2 had approved of his sale of his alleged interests in the LLC. In fact, Victim-1 and Victim-2 do not know RAFIQ and have confirmed that FamCap was never involved in or approved of any such transaction.

       d. During and to further the goals of this new scheme, RAFIQ also caused the creation and transmission of emails from the Fake FamCap Email Addresses and fake contracts and deal documents purporting to have been signed by Victim-1 or Victim-2 on behalf of FamCap that neither of them approved.

### RAFIQ's Prior "Pre-IPO Stock" Fraud

24. I have reviewed law enforcement databases and criminal history records, publicly available court filings, materials maintained by the Federal Bureau of Investigation ("FBI"), and news articles for information concerning SHAMOON RAFIQ, a/k/a "Shamoon Omer Rafiq," a/k/a "Omar Rafiq," a/k/a "Omer Rafiq," the defendant. I have also spoken with other members of the HSI Task Force working on this investigation who have communicated with the lead FBI case agent responsible for the investigation that resulted in RAFIQ's arrest in 2004. From such sources, I have learned the following, in substance and in part:

       a. On or about March 4, 2004, the United States Attorney's Office for the Eastern District of New York filed criminal complaint 04 Mag. 324 (VVP) under seal against RAFIQ (the "EDNY Criminal Complaint"). The EDNY Criminal Complaint charged RAFIQ with committing a wire fraud scheme in which he purported to sell pre-IPO stock when, in fact, RAFIQ did not own or have access to such stock.

b.     On or about March 5, 2004, RAFIQ was arrested based on the EDNY Criminal Complaint.  Following RAFIQ's arrest, law enforcement (among other things) took a photograph of RAFIQ (the "Arrest Photograph"), which I have reviewed.

c.     On or about May 17, 2014, RAFIQ pleaded guilty to wire fraud.  On or about October 26, 2004, RAFIQ was sentenced principally to 41 months in prison to be followed by five years of supervised release with special conditions requiring (among other things) that RAFIQ shall not illegally reenter the United States after being deported.

25.   Based on my review of criminal history records for SHAMOON RAFIQ, a/k/a "Shamoon Omer Rafiq," a/k/a "Omar Rafiq," a/k/a "Omer Rafiq," the defendant, I have learned, in substance and in part, that in connection with his 2004 arrest for wire fraud, RAFIQ reported to law enforcement that he was born on August 8, 1973 in Holland, Netherlands.  Those criminal history records indicate that RAFIQ had several aliases, including "Shamoon Omer Rafia."  As shown below, RAFIQ has at times used aliases that include "Omer" or "Omar" as a first or middle name.

26.   From my review of immigration records maintained by the United States Department of Homeland Security, I have learned the following, in substance and in part, concerning SHAMOON RAFIQ, a/k/a "Shamoon Omer Rafiq," a/k/a "Omar Rafiq," a/k/a "Omer Rafiq," the defendant.  In or about January 2018, RAFIQ submitted an application for a temporary travel visa to visit the United States. In this visa application, RAFIQ identified himself as "SHAMOON OMER RAFIQ"; he listed his date of birth as August 8, 1973 and his country of origin as The Hague, Zuid Holland, Netherlands; and he reported a home address on Grange Road in Singapore.  From my review of the visa application and public source data available online, I know that this visa application was electronically submitted online from a device that accessed the internet from an Internet Protocol ("IP") address, which I have learned from public source data is at a location in Singapore.  The visa application included a photograph of RAFIQ (the "Visa Photograph"), which I have reviewed.

## RAFIQ's New "Pre-IPO Stock" Fraud

27.   Based on the facts set forth below, I respectfully submit that there is probable cause to believe that SHAMOON RAFIQ, a/k/a "Shamoon Omer Rafiq," a/k/a "Omar Rafiq," a/k/a "Omer Rafiq," the defendant, has been perpetrating a new, ongoing scheme to defraud

victims by making false claims that he could sell investment interests in the LLC.

<u>The Creation of the Fake FamCap Website and Email Addresses</u>

28.  I have reviewed the website for the Official FamCap Website and public source data concerning the Official FamCap Website.  The FamCap Website reports the following, in substance and in part.  FamCap is a limited liability partnership headquartered in a location in Europe that serves as the investment arm of the Family's global conglomerate.  FamCap was co-founded more than five years ago by Victim-1 and another Family member. Victim-1 presently serves as the CEO of FamCap.  FamCap's activities include investing assets of Family members in international private equity, venture capital, real estate and debt.  FamCap has an investment team of investment and finance professionals that includes, among others, Victim-2, a partner of the firm.  The Official FamCap Website, which is available to the public, has photographs of Victim-1 and Victim-2 and information about their respective roles in the firm.  The web address for the FamCap Website lists the first three letters of the Family's surname followed by a dash and then the word "capital" (as in "https://www.[fam]-capital.com").  The FamCap Website has a "Contact Us" page listing "enquiry@[fam]capllp.com" as an email address for the firm.  According to public source data, a version of the Official FamCap Website was available on the internet about five years ago.  From public source data searches, I have learned that the email domain for the Official FamCap Email Addresses for Victim-1 and Victim-2 is associated with an IP address located in Europe.

29.  From reviewing documents provided by FamCap and the New York Firm, I have learned that the web address for the Fake FamCap Website lists the first three letters of the Family's surname followed by a dash and then the abbreviated term "cap" (rather than the full word "capital"), as in "https://www.[fam]-cap.com". The web address for the Fake FamCap Website is substantially similar to, but slightly different from the web address for the Official FamCap Website.  I recently attempted to visit the web address for the Fake FamCap Website ("https://www.[fam]-cap.com"), and was automatically routed to the Official FamCap Website ("https://www.[fam]-capital.com").

30.  I have reviewed the results of searches of website and email domain lookup tools that are publicly available online for the Fake Famcap Website and the FamCap Email Addresses for Victim-1 and Victim-2.  I have also reviewed information provided by an

internet domain hosting service run by GoDaddy, Inc. and an email domain hosting service run by Microsoft Corporation concerning the Fake FamCap Website and the Fake FamCap Email Addresses.  From these sources, I have learned the following, in substance and in part:

      a.   The website domain "[fam]-cap.com" (which is the website domain for the Fake FamCap Website) was created on or about July 12, 2020 and registered to GoDaddy's web domain hosting service.

      b.   Microsoft hosts the email domain "[fam]-cap.com" (which is the email domain for the Fake FamCap Email Addresses). That email domain was associated with an IP address ("104.47.125.36"), which, from public sources, I have learned is in Singapore.

### RAFIQ's "FamCap Fraud"

31.  I have reviewed the website for the New York Firm.  I and other law enforcement officers have also conducted several interviews of a founding partner of the New York Firm (the "New York Firm Partner").  I have also reviewed documents produced by the New York Firm, as well as documents produced by a law firm based in New York, New York that acted as escrow agent for the parties involved in the Alleged Airbnb Transaction ("Escrow Agent").  From my participation in interviewing the New York Firm Partner and my review of those documents and materials, I have learned the following, in substance and in part:

      a.   The New York Firm is a boutique investment firm that represents institutional clients and ultra high net worth individuals acting as secondary market buyers or sellers of stock in privately-held technology companies.

      b.   In or about July 2020, the New York Firm Partner was informed by one of his business contacts (the "Business Contact") at another investment firm about a purported opportunity to buy pre-IPO shares of Airbnb.  The Business Contact told the New York Firm Partner, in substance and in part, that (a) the Business Contact's firm had a client who supposedly owned membership interests in a special purpose investment vehicle ("SPV") that purportedly owned only pre-IPO shares of Airbnb stock; (b) his client's membership interests were equivalent to owning about $10 million worth of Airbnb shares at a price of $96 per share; and (c) his client wanted to sell this investment position at a rate that valued the Airbnb stock at $96 per share.  After

conferring with the Client, the New York Firm Partner informed the Business Contact that he had a client with general interest in considering the purported opportunity.

       c.   As a result of the foregoing, on or about July 21, 2020, one of the Business Contact's colleagues introduced his client —— an individual who later identified himself as a resident of Singapore named "Omar Rafiq" —— via email to New York Firm Partner.   In this introductory July 21 email, one of the Business Contact's colleagues wrote:   "Dear Omar, I want to introduce [New York Firm Partner] . . . who has the individual client interested in purchasing ~$4M of Airbnb at $96 per share all in."   In a resulting email chain, "Omar Rafiq," via an email account (the "Rafiq Email Account-1") wrote a reply email on July 21, 2020 in which he said "[h]i" to New York Partner and told New York Partner to "WhatsApp" him at a particular phone number.   "Omar Rafiq" signed the email "Best, Omar[.]"   From a search of public source data, I know that the phone number that "Omar Rafiq" identified as his contact number for WhatsApp is a Singapore phone number.   "Omar Rafiq" sent that July 21 reply email to New York Firm Partner and to himself at a second email account (the "Rafiq Email Account-2").

       d.   As described below, in subsequent communications that were conducted remotely via electronic means (including emails, WhatsApp text messages, and voice calls), "Omar Rafiq" made a number of false and misleading claims.

       e.   For instance, on or about July 21, 2020, at the request of "Omar Rafiq," the New York Firm Partner participated via Skype in a voice call with "Omar Rafiq."   During this Skype call, the following occurred, in substance and in part:

       i.   "Omar Rafiq" claimed that he was a close family friend of Victim-1.

       ii.   "Omar Rafiq" claimed that in or about 2015, he had invested about $2.5 million in an LLC, which he claimed was managed by FamCap.   He further claimed that this LLC was an SPV that was used to acquire roughly that much in series C shares of Airbnb for about $11 per share.   (Either on this call, or in subsequent communications, "Omar Rafiq" claimed that the LLC was called "[Fam] Capital Technology Fund, LLC.")

       iii.   "Omar Rafiq" claimed that he was now going through a divorce and was looking to sell all or part of his interests in

the LLC that held those Airbnb shares, which had since increased in value.

       iv. "Omar Rafiq" claimed that FamCap was giving him flexibility to explore avenues for liquidity through sales of his LLC interests so that he could meet any financial needs arising from his divorce.

       v. "Omar Rafiq" claimed that although the Family that owns FamCap would have to be involved in any sale of his LLC interests in light of FamCap's role as manager of the LLC, the Family would consent and be cooperative in facilitating any such transaction as long as the buyer was reputable.

       vi. "Omar Rafiq" claimed that he had recently sold less than $1 million of his LLC interests to a few friends at a valuation of roughly $82 per share.

       vii. "Omar Rafiq" also said that he lived in Singapore and claimed that he had given up his European passport for taxation purposes.

       f.  On or about August 3, 2020, New York Firm Partner and representatives of the Client participated in a voice call with "Omar Rafiq" via Google Hangout.  To arrange the call, New York Firm Partner emailed invitations to "Omar Rafiq" at both the Rafiq Email Account-1 and Rafiq Email Account-2.  During this call, the following occurred, in substance and in part.  "Omar Rafiq" reiterated claims, substantially similar to the claims that he made on his prior call with New York Firm Partner, concerning his alleged background and purported purpose for proceeding with the Alleged Airbnb Transaction.  The Client representatives told "Omar Rafiq" that they were interested in purchasing up to $5 million worth of membership interests in the LLC, and that they would communicate separately with New York Firm Partner to come up with a proposed offer for "Omar Rafiq" to consider.

       g.  Following the August 3 call, the Client directed New York Firm Partner to negotiate pricing with "Omar Rafiq" for the Alleged Airbnb Transaction.  In ensuing negotiations, "Omar Rafiq" agreed in principle to sell his purported membership interests in the LLC to the Client at a price of about $93.09 per share of Airbnb stock allegedly held by the LLC.  "Omar Rafiq" claimed that the pricing was based on allegedly similar pricing terms that he was receiving in a deal he was doing with a known competitor of the New York Firm to sell some of his membership interests in the LLC.

h.      On or about August 4, 2020, New York Firm Partner connected "Omar Rafiq" with Client representatives via an email in which New York Firm Partner wrote:

[Client representatives] –

I wanted to connect Omar on CC to ensure everyone has each other's contact info and we remain fully transparent in this deal to try and move forward efficiently, especially given time zones (Omar as noted is in Singapore while you folks are in [South America] and im [*sic*] in NYC).

Based on the context of the discussion, Omar has confirmed that he will hold $5mm for us at the moment as you speak [to the limited partners in your firm] to get to a dollar amount that makes sense at a price point.  I noted that Omar has some flex on the $96 price we entered into the discussion if we can move in a more expeditious manner to commit — subject to of course customary DD [*i.e.*, due diligence] which based on [Fam] Cap should be straightforward and to the point.

[. . . .]

Omar has also confirmed his intention in maintaining Airbnb ownership via the SPV which we know is important to you — as noted, I have had interactions with [FamCap] but his relationship is clearly strong. . . .

i.      In reply to that email, "Omar Rafiq," via the Rafiq Email Account-2, wrote:

Thanks [New York Firm Partner].

Hi [Client representatives],

Pleasure speaking with you earlier this evening.  To summarize I will "hold" $5mm of Airbnb shares until you have spoken to your LPs  which I am hoping you can conclude by Wednesday close of play this week.

In light of further transparency, you may want to ask [New York Firm Partner] about the other bids which have come thru via Russia, Switzerland and San Francisco in

14

the last few hours.  Please note that these bids are not
via [New York Firm Partner] or his firm.

If anything this should be a good indicator that
Airbnb is "wanted" and at the price offered is very
attractive.  All I ask respectfully ask that we conclude
this deal in fast and efficient manner assuming we move
forward.

Again you have my commitment that I will remain a
shareholder via [Fam] Cap in Airbnb until the IPO.

Furthermore I am always looking at extending my network
and via my Sand Hill Rd VC contacts have unprecedented
access to the worlds [*sic*] leading tech startups thus
after Airbnb we could talk other(s) such as Snowflake
for example which will be another great IPO.

I look forward to hearing from you.

Best, Omar

        j.  The Client representatives responded by email on or
about August 5, 2020 as follows, in substance and in part.  *First*,
the Client representatives "formally confirm[ed] [their firm's]
intent to move forward on a $5mm purchase of Airbnb Series C
Preferred shares via a membership interest via a Series of
The [Fam] Capital Technology Fund, LLC" at a "bid price [of]
$93.09/share," which "equates to membership interests underlying
53,712 Airbnb Series C preferred shares." *Second*, the Client
representatives noted that "while this is our minimum commitment
— we would be keen on growing this by another $1-3mm prior to
closing at these same terms if you are open to it but understand
that is a variable and you have other offers but want to make it
known." *Third*, the Client representatives reported that they
"understand that the proposed transaction is subject to mutual
agreement based upon approval by the Manager of the SPV [*i.e.*,
FamCap] and satisfactory review of the subscription documents by
[the Client]." *Fourth*, the Client representatives stated that
they were prepared to sign a mutual non-disclosure agreement "with
[Fam] Capital to ensure efficient sharing of underlying
documents," and requested that FamCap provide several documents
(including "[p]roof of ownership of Airbnb shares" and an LLC
"Operating Agreement" for holders of LLC membership interests.
*Finally*, the Client representatives reported that they had "talked
to [New York Firm Partner] about [Fam] Capital and based on our
other preliminary due diligence and your original comfort with the

15

family/team we are comfortable with proceeding forward towards an expected closing," and suggested that "Omar Rafiq" connect them with Victim-2 of FamCap based on their understanding that Victim-2 would be "point on the [Fam] Capital side" of the proposed transaction.

k.    On or about August 5, 2020, "Omar Rafiq," via the Rafiq Email Account-2, sent an email on which he copied two new email addresses into the above-described email thread with the Client and New York Firm Partner: specifically, the Fake FamCap Email Addresses.[1]  In this email, "Omar Rafiq," purporting to write to Victim-2 at the Fake FamCap Victim-2 Email Address, wrote:  "+ [Victim-2] [;] @[Victim-2] — I've taken liberty to get the [non-disclosure agreement] executed with folks at [the Client] already and it should be sent to [Victim-1] shortly as you have more urgent matters to deal with now.  Also please see below request [from the Client representatives] on documents, they are aware that [Fam] Cap wont [*sic*] be disclosing any LP [*i.e.*, limited partner] and/or their shareholding information.  I will update you on the exact shares that need to be transferred as this is[.]  Please take care of yourself and family."  "Omar Rafiq" signed the email "Best, Omar[.]"

l.    Later in that email thread, the Fake FamCap Victim-1 Email Address sent an email on or about August 6, 2020 to the same group of email recipients, in which an indivual who purported to be Victim-1 wrote:  "[New York Firm Partner], Given the situation in Beirut and that [Victim-2's] family members are still missing, please allow him some time to revert on the

---

[1]  From my training and experience, I know that an email address such as "johndoe@company.com" can be grouped into two parts:  the first part identifies the user of the email address ("John Doe") and the second part after the "@" symbol identifies the email domain name ("@company.com").  As shown below, the Fake FamCap Email Addresses closely resembled, but were slightly different from, their Official FamCap Email Addresses.  With respect to the email usernames of the Fake FamCap Email Addresses, both consisted of the first initial of the relevant victim's first name and his full surname.  With respect to the email domain name of the Fake FamCap Email Addresses, both consisted of the first three letters of the Family's surname followed by a dash and then the first three letters of the word capital (as in "@[fam]-cap.com").  As shown below, the actual email domain for the Official FamCap Email Addresses of Victim-1 and Victim-2 is "@[fam]capllp.com" with no dash in the middle.

documents requested.  I should be back in London early next week and if need be will do the needful [*sic*] from my end."

m.   On or about August 8, 2020, the Business Contact, on behalf of his client "Omar Rafiq," emailed New York Firm Partner a purported operating agreement for the LLC (the "Fake Operating Agreement") and a purported private placement memorandum for the LLC (the "Fake PPM").

n.   On or about August 8, 2020, New York Firm Partner emailed the Fake Operating Agreement and Fake PPM to the Client representatives, "Omar Rafiq" at Rafiq Email Account-2, the Fake FamCap Email Addresses for Victim-1 and Victim-2, writing:  "Hi [Client representatives], Please see attached the Operating Agreement and the Private Placement Memorandum for the The [*sic*] [Fam] Capital Technology Fund, LLC.  [Victim-1] thanks for getting this over to us.  [Victim-2] [our] thoughts are with your family and hope there has been positive progress."

o.   On or about August 11, 2020, while New York Firm Partner was engaged in communications with "Omar Rafiq" to negotiate the pricing and size of the sale of his alleged LLC membership interests, there was public reporting that Airbnb intended to file paperwork with the United States Securities and Exchange Commission to lay the groundwork for an IPO.  Following that development, the Client agreed to buy about $9 million worth of alleged membership interests in the LLC from "Omar Rafiq."

p.   "Omar Rafiq" informed New York Firm Partner that he wanted the Client to transmit the $9 million in funds to a bank account registered to an alleged "account manager" that he would name, claiming that he was having "divorce issues" and did not want his wife to see these funds going into an account that his wife was aware of and might monitor.  New York Firm Partner instead proposed to have the Client place the $9 million in funds in escrow until all parties were satisfied that all required conditions for their anticipated transaction had been met, following which the funds would be transmitted to a receiving bank account to be designated by "Omar Rafiq."

q.   On or about August 13, 2020, "Omar Rafiq," via Rafiq Email Account-2, sent an email to New York Firm Partner and the Client representatives as well as the Fake FamCap Email Addresses for Victim-1 and Victim-2 laying out a proposed escrow procedure to effectuate the $9 million transaction.  In the same email thread, a subsequent email from the Fake FamCap Victim-2 Email

Address stated: "Team, Good work, in principle we are agreeable on the terms set forth in Omer's email . . . .." The email was purportedly signed with Victim-2's initials. An escrow agreement was subsequently signed electronically on or about August 13, 2020 by a representative of the Client, by an individual purporting to be Victim-2, and by the Escow Agent law firm based in New York, New York (the "Escrow Agreement").

r.   Pursuant to this Escrow Agreement, the Client wired $9,000,034.29 for the Alleged Airbnb Transaction in the afternoon on or about August 14, 2020 to the Escrow Account maintained by the Escrow Agent in New York, New York. At approximately 4:13PM on or about Friday, August 14, 2020, the Escrow Agent sent an email to Client representatives, New York Firm Partner, "Omar Rafiq," via Rafiq Email Account-2, and the Fake FamCap Email Addresses, among others, in which the Escrow Agent wrote: "All, Please [be] advised that the wire has hit our escrow account. Because our wire cut off is 4 pm ET, will circle back to everyone on Monday to complete the transaction. Have a nice weekend."

s.   On or about Friday, August 14, 2020, "Omar Rafiq" informed New York Firm Partner that when the time came for the release of the funds in the Escrow Account, he wanted the escrow funds to be released to Individual-1. The Business Contact, who was representing "Omar Rafiq" in the Alleged Airbnb Transaction, separately provided an email address for Individual-1 (the "Individual-1 Email Account") to the New York Firm Partner.

### The New York Firm Discovers RAFIQ's "FamCap Fraud"

32.   From my participation in interviews of New York Firm Partner, my review of documents and other materials produced by his firm and by Escrow Agent's firm, and my participation in the investigation of this case, I have learned the following, in substance and in part:

a.   On or about the evening of August 13, 2020, the night before the Client's $9 million funds were wired into the Escrow Account, New York Firm Partner participated in a call with a professional associate at a competitor firm (the "Professional Associate"). Toward the end of this call, the Professional Associate reported, in substance and in part, that (i) his firm had been exploring a potential deal with an "Omar Rafiq"; (ii) their discussions had almost resulted in a completed deal; (iii) in the course of their due diligence for the deal, "Omar Rafiq" provided a Netherlands passport in his name to Professional Associate's firm; and (iv) when Professional Associate's firm ran

a compliance check based on the passport, the firm learned that "Omar Rafiq" had the same birthday and country of origin as a "Shamoon Omar Rafiq" of the Netherlands who had previously been convicted of fraud.[2]   After learning this information, New York Firm Partner and his firm took the following steps, among others, that occurred on or about Friday, August 14, 2020:  (i) through a trusted intermediary, the New York Firm contacted Victim-1 about the foregoing circumstances and received confirmation that FamCap was not involved in the Alleged Airbnb Transaction with "Omar Rafiq"; and (ii) New York Firm Partner informed the Escrow Agent of the foregoing circumstances and instructed the Escrow Agent not to release the Client's funds from escrow after the funds arrived in the Escrow Account.

        b.    In addition, New York Firm Partner was also put in touch with Victim-2.  In approximately the late afternoon on or about Friday, August 14, 2020, New York Firm Partner forwarded to the Official FamCap Victim-2 Email Address various communications that the New York Firm had received from "Omar Rafiq" and the Fake FamCap Email Addresses.  Victim-2 confirmed that FamCap had not participated in those communications or the Alleged Airbnb Transaction.

        c.    Late in the day on or about August 14, 2020, while the New York Firm was in the process of confirming that the Alleged Airbnb Transaction was a fraud, the roughly $9 million in funds that the Client wired to the Escrow Account for the alleged transaction arrived in the Escrow Account.

        d.    On or about August 15, 2020, the New York Firm and Escrow Agent decided to continue communicating with "Omar Rafiq" as though the New York Firm and the Client still intended to proceed with the Alleged Airbnb Transaction, in order to collect evidence that would be useful for law enforcement.  To this end, the New York Firm requested various documents from "Omar Rafiq" for the purported purpose of satisfying applicable know-your-

---

[2]  The day after this call, on or about Friday, August 14, 2020 at approximately 5:07PM, the Professional Associate's firm also sent an email to a variety of peer firms in their industry, including the New York Firm, that stated:  "We recently were engaged with a [purported] seller of [Fam] Capital AirBnB SPV interests by the name of Omer Rafiq.  Upon due diligence we discovered it was a very sophisticated fraud.  He has even set up a fake [Fam] Capital web site.  Luckily none of our customers were affected.  We have been told by other broker dealer partners that he has approached them as well. If you encounter Omer, stay away."

customer ("KYC") and anti-money laundering ("AML") requirements to effectuate release of the $9 million in Escrow Account funds to "Omar Rafiq." As a result, on or about August 15, 2020, "Omar Rafiq," via Rafiq Email Account-2, emailed New York Firm Partner a scanned copy of his Netherlands passport issued in 2016 (the "Netherlands Passport").[3] In the email forwarding that document, "Omar Rafiq" wrote: "[New York Firm Partner], Attached. I've spoken to [Individual-1] and she will share but she would like the request to come directly from the [Escrow Agent's] office to her email so she can contact him/her and they can explain why she needs to send her passport."

e.    In a reply email to "Omar Rafiq" on or about August 15, 2020, New York Firm Partner copied Individual-1 at an email that he had been given for her (the "Individual-1 Email Account"), the Fake FamCap Email Addresses, and the Escrow Agent, writing: "Thanks Omar. [Business Contact] provided [Individual-1's] email address [*i.e.*, the Individual-1 Email Account][a] moment ago. Looping in [Fam] Capital too. [Individual-1], [Escrow Agent] on CC who is the attorney controlling the escrow will confirm that A) we and he need your full name and a valid passport for KYC/compliance purposes [a]nd B) and account number for which funds should be released per the attorney escrow agreement that you control — however that needs to be confirmed and explicitly directed by [Victim-2]/[Victim-1] at [Fam] Capital so either they can provide this or Omar/[Individual-1] can provide and we will need both a verbal and digital confirmation from [Fam] Capital that this is acceptable and authorized."

f.    The following additional communications occurred in that email thread on or about August 15, 2020, in substance and in part. *First*, Individual-1 confirmed that she had separately sent a scanned copy of her passport to the Escrow Agent ("Hi All I have sent my passport to [Escrow Agent] already"), which was a Vietnamese passport in a name that was different from the email username assigned to the Individual-1 Email Account. *Second*, New York Firm Partner replied asking Individual-1 to provide wiring instructions for the purported purpose of receiving the escrowed funds for the Alleged Airbnb Transaction. *Third*, the Individual-1 Email Account emailed a document with wire instructions to the New York Firm Partner and Escrow Agent, among others. The cover email, which said "Hi All[,] Please see attached wiring

---

[3]    This scanned copy of the 2016 Netherlands Passport was emailed by "Om**a**r Rafiq" from Rafiq Email Account-2 (emphasis added), but the Netherlands Passport indicates that his name is "Om**e**r Rafiq" (emphasis added).

instructions," was signed "best, Omar," even though it was sent from the Individual-1 Email Account associated with Individual-1. The enclosed document listed a checking account at a bank branch in Singapore (namely, the Individual-1 Bank Account), reported that the account was registered under the same name that is set forth in Individual-1's Vietnamese passport, and listed "Omar Rafiq" and his contact information as the relevant "**Contact**" for the anticipated inbound wire from the Escrow Account. (Bold in original). Specifically, the contact section at the bottom of the wire instructions stated "**Contact:  Omar Rafiq**" in bold followed by the email address for the Rafiq Email Account-2 and a phone number for "Omar Rafiq."

g.   As noted, the law firm acting as Escrow Agent was based in New York, New York and maintained the Escrow Account at a bank account in New York, New York. On or about August 15, 2020, the Individual-1 Email Account emailed a scanned copy of Individual-1's Vietnamese passport to the Escrow Agent in response to requests from New York Firm Partner and Escrow Agent indicating that this document was necessary to effectuate release of the $9 million in escrowed funds to the Individual-1 Bank Account.

h.   On or about Saturday, August 15, 2020, outside counsel for FamCap ("FamCap Counsel") reported the fraudulent scheme at issue in this case to law enforcement.

i.   On or about Monday, August 17, 2020, at the direction of law enforcement, New York Firm Partner and the Escrow Agent participated in a video conference via Zoom with "Omar Rafiq" and Individual-1 (the "Zoom Meeting") that New York Firm Partner covertly video recorded. To arrange the Zoom Meeting, Escrow Agent sent an email to "Omar Rafiq," via the Rafiq Email Account-2, and New York Firm Partner in which Escrow Agent made the following claims at the direction of law enforcement:

Morning everyone,

I just got off with [the New York] bank [where the Escrow Account was held]. In order to proceed under the AML (anti-money laundering) laws, I will need a copy of the passports for [Victim-2] and [Victim-1]. In addition, I need a copy of the [Fam] Cap formation documents. Finally, [the] bank requested that I schedule a quick video (Zoom) call to confirm that the individuals in the passports to the beneficiary account (Omar and [Individual-1]), are in fact, the

people that we are dealing with.  Sorry about the
additional diligence, but we are at the finish line.

        j.   "Omar  Rafiq,"  via  Rafiq  Email  Account-2,
subsequently sent an email to Escrow Agent and Individual-1 Email
Account at approximately 10:42AM on or about August 17, 2020 with
an invitation, instructions and a hyperlink to join the Zoom
Meeting.  From my review of video footage that New York Firm
Partner covertly recorded of the August 17 Zoom Meeting, I have
learned that during the Zoom Meeting, the following occurred, in
substance and in part.  A man, who identified himself on the video
as "Omar Rafiq," born in "The Hague, Netherlands," with a date of
birth of "August 8, 1973," participated in the Zoom Meeting from
an outdoor location in an urban area (in email correspondence
arranging the Zoom Meeting, "Omar Rafiq" identified this outdoor
location as being in "SG," which I believe from my training and
experience to be shorthand for "Singapore").  Referencing the
FamCap diligence documents requested in the Escrow Agent's email
arranging the Zoom Meeting, the Escrow Agent asked "Omar Rafiq"
during the Zoom Meeting if he was going to send the requested
documents, to which "Omar Rafiq" responded "Uhh, I don't have
those, uhh, [Escrow Agent], so they, I mean, I've requested them
to send it directly to you  . . . ."  In addition, a woman, who
matched the appearance of the person depicted in the Vietnamese
passport provided by Individual-1, participated in the Zoom
Meeting from what appeared to be a separate, indoor location.

### RAFIQ's Claims about FamCap were False

        33.  I and other members of the HIS Task Force have separately
interviewed Victim-1 and Victim-2.  I have also reviewed documents
and information provided by FamCap through FamCap Counsel.  From
those sources, I have learned, in substance and in part, the
following facts refuting various claims that "Omar Rafiq" made in
soliciting $9 million for the Alleged Airbnb Transaction:

        a.   Victim-1 and Victim-2 do not know anyone named
"Omar Rafiq," and when each of those victims was shown photographs
of "Omar Rafiq," neither of them recognized him.

        b.   Neither Victim-1, Victim-2, nor FamCap participated
in or authorized the Alleged Airbnb Transaction proposed by "Omar
Rafiq" to the New York Firm and the Client.

        c.   Victim-1's official FamCap email address is
"[Victim-1]@[fam]capllp.com" with no dash in the email domain, not

the Fake FamCap Victim-1 Email Address "[Victim-1]@[fam]-cap.com" with a dash in the email domain.

d.   Similarly, Victim-2's FamCap email address is "[Victim-2]@[fam]capllp.com" with no dash in the email domain, not the Fake FamCap Victim-2 Email Address "[Victim-2]@[fam]-cap.com" with a dash in the email domain.

e.   Neither Victim-1 nor Victim-2 sent, authorized, or signed any email communications from the Fake FamCap Email Addresses purporting to belong to them.

f.   FamCap does not have any general or limited partners or investors who are not members of the Family.

g.   The purported LLC at issue —— "[Fam] Capital Technology Fund, LLC" —— does not exist.

h.   FamCap never issued or approved the Fake PPM or the Fake Operating Agreement.

i.   Victim-1 did not sign the Fake Operating Agreement. Victim-1 did not authorize the use of his name in that document, and the purported signature of Victim-1 on that document was not written or approved by him.

j.   Victim-2 did not sign the Escrow Agreement. Victim-2 did not authorize the use of his name in that document, and the purported signature of Victim-2 on the document was not written or approved by him.

## "Omar Rafiq" IS SHAMOON RAFIQ

34.   Based on my participation in the investigation of this case, I believe and respectfully submit that there is probable cause to believe that SHAMOON RAFIQ, a/k/a "Shamoon Omer Rafiq," a/k/a "Omar Rafiq," a/k/a "Omer Rafiq," the defendant, is the same person as the "Omar Rafiq" who fraudulently solicited $9 million for the Alleged Airbnb Transaction. The facts that form the basis for this belief include the following:

a.   *First*, as noted above, "Omar Rafiq" used the Rafiq Email Account-2 to send an email inviting others to the August 17, 2020 Zoom Meeting concerning the Alleged Airbnb Transaction. Based on my review of documents produced by Zoom, I have learned, in substance and in part, that the user of the Zoom account registered

to the Rafiq Email Account-2 has an account name of "Shamoon Omer Rafiq," a user name of "Omar (Owner)," and lists the Rafiq Email Account-2 as the account's user email address.  Accordingly, the Zoom account belonging to "Omar Rafiq" is registered under an account name ("Shamoon Omer Rafiq") with the same first name and surname as RAFIQ.

      b.  *Second*, I have compared:  (i) criminal history records for RAFIQ, including his Arrest Photograph and biographical information obtained from him in connection with his 2004 arrest; (ii) the 2016 Netherlands Passport under the name "Omer Rafiq" that "Omar Rafiq" provided in August 2020 to the New York Firm in connection with the Alleged Airbnb Transaction; (iii) the 2018 Visa Photograph under the name "SHAMOON OMER RAFIQ" that RAFIQ submitted with a visa application; (iv) the New York Firm Partner's covert video footage of his August 2020 Zoom Meeting with "Omar Rafiq"; and (v) a still photograph of "Omar Rafiq" that was excerpted from that video footage (the "Zoom Photograph"). From doing so, I have learned, in substance and in part, that: (i) the date of birth (August 8, 1973) and country of origin (Netherlands) that RAFIQ reported to law enforcement in connection with his 2004 arrest are identical to the date of birth (August 8, 1973) and country of origin ("'s-Gravenhage,'" which I have learned is a Dutch term used for The Hague, a city in Netherlands) that are indicated in the 2016 Netherlands Passport that "Omar Rafiq" furnished to the New York Firm and the 2018 visa application submitted by RAFIQ, and also to the date of birth and country of origin that "Omar Rafiq" confirmed during the August 2020 Zoom Meeting; (ii) RAFIQ has the same last name as "Omar Rafiq" and RAFIQ's middle name "Omer" (as reflected in his 2018 visa application under the name "SHAMOON OMER RAFIQ") resembles the first name "Omar" in "Omar Rafiq"; and (iii) although 16 years have passed since the Arrest Photograph was taken of RAFIQ, there is a strong resemblance between RAFIQ as depicted in his 2004 Arrest Photograph and 2018 visa application and "Omar Rafiq" as depicted in his 2016 Netherlands Passport photograph and August 2020 Zoom Photograph.

c.   A comparison of those photographs follows:



WHEREFORE, I respectfully request that a warrant be issued for the arrest of SHAMOON RAFIQ, a/k/a "Shamoon Omer Rafiq," a/k/a "Omar Rafiq," a/k/a "Omer Rafiq," the defendant, and that he be imprisoned or bailed, as the case may be.

/s Jose L. Mena (By Court with authorization)
_____
JOSE L. MENA
Postal Inspector
United States Postal Inspection Service


Sworn to me through the transmission of
this Complaint by reliable electronic means,
pursuant to Federal Rules of Criminal Procedure
41(d)(3) and 4.1, this
25th day of August 2020

_____
THE HONORABLE SARAH L. CAVE
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK