

**VIA ECF**                                                               May 7, 2024
The Honorable Victor Marrero
Senior United States District Judge
United States District Court
500 Pearl Street
New York, New York 10007

                                RE:      ***United States v. Shamoon Rafiq***
                                                 ***24-Cr-98-VM***

Dear Judge Marrero:

      On February 22, 2024, pursuant to a plea agreement with the government, Shamoon Omer Rafiq pleaded guilty to conspiracy to commit securities fraud and wire fraud, in violation of 18 U.S.C. § 371. His sentencing before Your Honor is scheduled for May 17, 2024. The parties and the Probation Department agree that Mr. Rafiq's final offense level under the sentencing guidelines is 27, his Criminal History Category is II, and his advisory sentencing range is therefore 60 months' imprisonment.[1] *See* Presentence Report (PSR) at PSR ¶¶ 41, 46, 89.[2] For the reasons set forth below, primarily the horror of Mr. Rafiq's conditions of confinement in Singapore before his voluntary extradition, the difficulty of confinement at MDC, his personal history and characteristics, his psychological diagnosis and his newfound appreciation of the wrongfulness of his conduct, I respectfully urge the Court to impose a term below the 60 month guideline range. Such a sentence would, under the circumstances, be sufficient but not greater than necessary to satisfy the aims of sentencing contained in 18 U.S.C. §3553(a).

**<u>Early Life</u>**

      Shamoon Omer Rafiq, who is of Pakistani origin, was born to immigrant parents in the Netherlands. As an outsider, Mr. Rafiq felt self-conscious from a young age. Growing up, he was also aware that his family was not rich in comparison to other children who had more things and more liberties than he was allowed. When he was 7 or 8 years old, his parents took

---

[1] Pursuant to USSG § 5G1.1(a), the guideline is assessed at 60 months due to the statutory maximum sentence permitted for a conviction of 18 U.S.C. § 371.

[2] Mr. Rafiq objects to ¶ 21 of the PSR to the extent that it states that Mr. Rafiq was wired slightly more than $1 million by the "California Group." Mr. Rafiq did not receive those funds directly and they were not wired to him directly. This objection has no impact on the parties' stipulated guideline range.

him out of his public elementary school and enrolled him in a special school on the advice of his teachers, who observed that he did not study as well as other children. Young Shamoon hated being at a "special school." He felt inferior to his peers and to his sister, Sherry Rafiq ("Sherry"), who, despite being younger, excelled in her studies.



███████████████████ Shamoon's performance at school deteriorated, causing him to be held back a year. He graduated from secondary school at the age of 17 (one year older than the rest of his cohort) and enrolled in an Information Technology institute, where he failed his first year twice and was not allowed to try again.

By 18 years old, Mr. Rafiq felt like a failure and an outsider. In order to compensate for this sense of failure, he began to go to extreme lengths to impress others and to be held in high regard. Such lengths included grandiose promises (which he could not fulfil), dishonestly concealing information and even breaking the law against his better judgment. Each instance landed Omer in trouble. And yet, despite repeated self-jeopardy, Omer could not seem to transcend his tendency to engage in people-pleasing behavior at his own expense.

On more than one occasion, Mr. Rafiq's loved ones suspected that he might have psychological issues and tried to convince him to seek psychological help. These attempts were unsuccessful. It was not until many years later, as described below, that Mr. Rafiq was diagnosed with psychiatric conditions that explained a lot about his youth, his difficulty fitting in, his abnormal efforts to impress others, and his lack of concern about the effect his destructive actions had on others.

**Mr. Rafiq's Experience of Incarceration**

<u>MDC</u>

On January 11, 2024, Mr. Rafiq was extradited to the United States from Singapore. PSR at 1. He made his initial appearance in the Southern District of New York the next day, at which point he was remanded into U.S. federal custody at the MDC Brooklyn ("MDC"). *Id.* He has remained there ever since. The Court is, of course, intimately familiar with the conditions of confinement suffered by detainees at the MDC during the COVID pandemic. However, while the Covid epidemic has thankfully receded, its horrific impact on the conditions of federal inmates has only marginally improved. Conditions of confinement continue to be far harsher than they were before the epidemic. Lockdowns are common, and access to fresh air, exercise, and law library has been severely curtailed. The ongoing problems seem to be related to repeated staffing shortages in the BOP that have turned

what should be a normal prison experience into one synonymous with disciplinary segregation.  *See e.g.* https://www.nytimes.com/2023/05/01/us/politics/prison-guards-teachers-staff.html; *See also United States v. Gustavo Chavez*, No. 22-CR-303 (JMF), 2024 WL 50233, at *1 (S.D.N.Y. Jan. 4, 2024) (Judge Furman discussing the disastrous effects of staffing shortages on the MDC).

During the four months of his confinement at MDC, Mr. Rafiq has endured dozens of lockdowns confined to a tiny cell with a cellmate for 23, sometimes 24, hours a day for days on end.  These recurring conditions, rivaling those of third-world countries, have been deeply physically and psychologically damaging.  Mr. Rafiq has been fed food well past its expiration date and been served spoiled milk.  He has seen first-hand the type of disgusting food issues chronicled in a recent New York Daily News article about the MDC, including the presence of maggots in certain dishes served for dinner.  *See New York Daily News* article, March 30, 2024, Exhibit A.

Mr. Rafiq's incarceration at MDC has been a shock to the system, especially in comparison to his experience there twenty years ago, when conditions were far more humane.  Punishment in the United States is not supposed to look like the conditions people endure in underdeveloped countries or in the gulags of Russia.  Yet that is exactly what a term of detention at the MDC can be compared to.  Courts have not been shy about acknowledging the brutality of the conditions of confinement endured by defendants in this district and reducing sentences to account for those experiences.  Even before the Covid epidemic, for example, in February 2019, Judge Furman recognized the inadequacy of the conditions at MDC, remarking at sentencing in that case that

> the conditions that I read about are the conditions that one associates with a third world country and not a country like this, and nobody in detention, whether convicted, not convicted, awaiting sentencing, should have to endure that as the detainees did at the MDC. . . .  I do think that some acknowledgment of these recent events is appropriate here.

*United States v. Ozols*, 16 Cr. 392 (JMF), Tr. February 22, 2019, at 31 (ECF #234).  Similarly, in May 2020, Judge Berman criticized MDC while imposing a sentence of essentially "time-served" in a $2.5 million fraud case, characterizing the conditions at MDC and the Metropolitan Correctional Center ("MCC") as "unfortunate, terrible[,]" both before and during the coronavirus pandemic, and decrying MDC's "deficient system[.]"  *See* Stewart Bishop, "NY Judge Rips 'Terrible' Conditions At NYC Federal Jails," *Law360* (May 5, 2020), available at bit.ly/3yVKk8F. Likewise, in 2021, Judge Kuntz in the Eastern District  "railed at the conditions inside the Brooklyn jail after it took several days to fix a 60-year-old bank robbery suspect's toilet."  Noah Goldberg and John Annese, "More problems at fed jail in Brooklyn; Inmates report no lights, water or hot foodeat, few staffers," *New York Daily News* (Oct. 10, 2021) ("*More Problems at Fed Jail In Brooklyn*"), available at bit.ly/3CEZ0s4.  Describing the situation at MDC as "an ongoing disgrace," Judge Kuntz explained, he did not "care if the defendant is Jack the Ripper[.] . . . We treat people under our care with respect and decency because it reflects on the entirety of the criminal justice system."  *Id.*  *See also* Judge McMahon's widely reported remarks during an April 2021 sentencing in the Southern District of New York, *United States v. Days*, 19 Cr.

619 (CM) (ECF # 35), (S.D.N.Y., April 29, 2021), at 18-20; Shayna Jacobs, "Judge says 'morons' run New York's federal jails, denounces 'inhuman' conditions," *The Washington Post* (May 7, 2021), available at wapo.st/341MTWy.

<u>Changi Prison, Singapore</u>

But, shockingly, Mr. Rafiq's brutal experience at MDC pales in comparison to his confinement at Changi Prison in Singapore, where he was incarcerated from April 2021 until his extradition to the U.S. on January 11, 2024. PSR ¶ 62. For those nearly three years, he spent most of his time in a small cell, sometimes with several other inmates. The conditions there were unlike anything Mr. Rafiq had ever faced before. For his entire stay, he slept on the floor of his cell on a straw mat.[3] Inmates were not given mattresses. Nor could they request commissary or phone access. They were not permitted to wear undergarments or shoes. Mr. Rafiq was confined to his cell for 23 hours a day, 5 days a week. He had limited access to food, losing more than 30 pounds during his stay. His best friend at the facility, Song, committed suicide behind bars at just 28-years-old.

Mr. Rafiq also developed a litany of health issues due to the challenging living environment, none of which he had prior to his time in the Singaporean prison. He developed boils because of the heat—on summer days, indoor temperatures were unregulated and could reach up to 110-120 degrees. The boils needed to be surgically removed in 2022. He got Covid three times. He also believes that the poor jail conditions led to his spinal stenosis (C5-C6), his multiple surgeries at Changi General Hospital's Department of Neurology, and his permanent nerve damage. PSR ¶ 62. After the surgeries, Mr. Rafiq was subjected to 3-and-4-point restraints; he recalls remaining in cuffs both before and after he was put to sleep and throughout his recovery, placing a considerable amount of strain on his body and pressure on his incision cites.

In addition to the fact that Changi inmates were not provided with mattresses and were housed in tiny cells with few reading materials and little social interaction, inmates were forced to eat and use the bathroom in their cells with barely any separation. Corporal punishment, *e.g.*, "four strokes of cane," was a commonplace response to inmate non-compliance. Several of Mr. Rafiq's fellow inmates were executed while he was detained there, adding to the tremendously stressful atmosphere he experienced at Changi.

During his time at Changi prison, Mr. Rafiq had only two visitors – his friends Donna and Lia Jakins. In her letter to the Court, Lia corroborates the misery Mr. Rafiq endured:

> Omar has experienced suffering like many of us living in a developed country never will. He slept on a concrete floor in a cell the size of a closet with multiple cellmates for 3 years. He went several weeks at a

---

[3] *See* Exhibit B - Photo of Inmate in Changi Prison Cell, from In a First, 5 Inmates Jailed Multiple Times Tell All From Inside Changi's Maximum-Security Prison, Derrick A Paulo with Channel News Asia. (February 5, 2022), available at https://www.channelnewsasia.com/cna-insider/first-5-inmates-jailed-multiple-times-tell-all-inside-changis-maximum-security-prison-2480006; and Exhibit B - Photo of Straw Mat Provided to Inmates at Changi Prison

>time without being able to leave that cell. He endured hunger because Changi prison does not provide inmates with enough food and the food they do provide is of such low quality, that we wouldn't feed it to our animals. He developed health conditions that required him to spend considerable time in the medical facility where he and others were shackled in two places to the metal bed and unable to go to the bathroom when needed. He observed young men from disadvantaged socioeconomic backgrounds being executed for selling substances that are legal elsewhere, or using substances for which we would typically offer rehabilitation instead. The list of unfathomable experiences are endless and inconceivable to you and I. Most people in his shoes fall to mental illness, but Omar did not.

Letter from Lia Jakins, Exhibit C.

Recent investigations into Singapore's notorious Changi prison, where Mr. Rafiq was detained, corroborate his experience, with some news outlets remarking that the facility is reminiscent of a "concrete purgatory." *See* In a First, 5 Inmates Jailed Multiple Times Tell All From Inside Changi's Maximum-Security Prison, Derrick A Paulo with Channel News Asia. (February 5, 2022), available at https://www.channelnewsasia.com/cna-insider/first-5-inmates-jailed-multiple-times-tell-all-inside-changis-maximum-security-prison-2480006. Conditions at Changi are considered to be so barbaric that countries like the United Kingdom have considered not extraditing its citizens to Singapore on that basis. *See e.g.* StanChart Robber David Roach Sentenced to Jail in Singapore 5 Years After High-Profile Bank Heist and Escape, Lydia Lam with Channel News Asia. (July 7, 2021), available at https://www.channelnewsasia.com/singapore/stanchart-robber-david-roach-bank-court-jail1987696#:~:text=He%20was%20released%20on%20Jan,to%20the%20Singapore%20Police%20Force.

Shamoon Rafiq committed a financial fraud. Spending time in prison is a consequence of that behavior. But the conditions of confinement that he has endured go well beyond what a civilized society would expect punishment to be for a person like Mr. Rafiq. In the United States, a white collar offender would expect to be imprisoned in a low security facility or a prison camp. He would expect to have access to the library, to adequate medical care. He would be able to spend time outside. Prison experiences for those who are not considered maximum high risk or dangers to others are expected to be civilized. That has not been Mr. Rafiq's experience. He has been subject to years of confinement to tiny cells, sometimes for weeks on end. He has been deprived of basic needs, such as a mattress, adequate food, and socialization. His experience has been pure misery, and no Court in this country would intentionally sentence a defendant to punishment of the kind he has suffered, both at Changi, and now at MDC.

It is well recognized that even before *Booker*, courts held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departure." *See United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001). *See also United States v. Farouil*, 124 F.3d 838, 847 (7th Cir.1997) (harsh conditions of confinement

constitute valid ground for departure); *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n.2 (2d Cir. 1996) (remanding for reasons for downward departure due to "harsher incarceration" due to unavailability of programs).  And courts routinely consider the severity of presentence confinement as a basis for reducing the sentence under 18 U.S.C. § 3553(a).  As Judge Engelmayer observed in *United States v. De Jesus*, 20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020), "[p]rison is supposed to be punishment, [] it is not supposed to be trauma of that nature or close."  *Id.*  As the Court reasoned, "[m]y colleagues and I commonly informally credit prisoners who have served time awaiting extradition in dreadful prisons overseas with more time served than measured by the calendar.  The same logic applies here, and then some . . ."  *Id.*  Sentencing Transcript, July 1, 2020, at 36 (ECF # 21).  *See also United States v. Romero*, 15-Cr-445 (PAE), ECF. # 1194 (4/16/21) at 7 ("this Court has repeatedly recognized that a day spent in prison custody in exceptionally arduous conditions is properly viewed as equivalent to more than a day in ordinary custody.").

There is no question that Shamoon's Rafiq's prison experience has been "exceptionally arduous."  Accordingly, I respectfully urge the Court to conclude that Mr. Rafiq's conditions of confinement up to this point are a mitigating circumstance that it should consider in its sentencing determination.

**Diagnosis, Self-Awareness and Remorse**

One positive event did occur during Mr. Rafiq's miserable time at Changi prison in Singapore.  For sentencing purposes, he was evaluated by a psychologist, who diagnosed him with two well-recognized psychological conditions: ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ These diagnoses were confirmed by Dr. Jacob Rajesh, a psychiatrist assigned to Changi prison.  Following his diagnoses, Mr. Rafiq benefitted from six months of therapeutic treatment by Dr. Rama.  *See* PSR at ¶ 64.

The evaluation was a watershed moment for Mr. Rafiq because he finally understood the psychological bases for what drove him to continually engage in the kinds of behavior that resulted in his criminal charges. The diagnoses and the subsequent therapeutic treatment with Dr. Rama unlocked an understanding of his psyche that had always eluded him. ▬▬ predisposed him to unnaturally craving admiration, success, and power in abnormal amounts. It also predisposed him to lack the empathy that would otherwise stop a person from going to illegal lengths to maintain that admiration and image of success. This is something that Mr. Rafiq had not understood before.  As he writes in his letter to the Court,

> Until recently, I had an impossible relationship with myself. It's love and hate, construction and destruction, genuine and false. I could be warm to myself, but also very critical. I could tell my darkest secrets to myself, but also I cheat and delude myself. I know what's good for myself, but I often do exactly the opposite, while making convincing excuses to appease myself. I can be awfully proud of myself, but the next

> day I want to run away. And in return my self talks non-stop - planning, strategizing, debating, assessing, critiquing, self-judging, questioning, doubting. . . .In the past, I allowed my ego to prevail over my integrity. I avoided owning my actions, blamed others for the choices I made, and played the victim. This is not who I want to be anymore. I am beginning to learn the power of honesty. This has set me free from the turmoil that has consumed me over the years. I can now be honest with my family, my friends, and myself and as a result, I am free to learn and grow from my mistakes. I've made a serious mistake, and I'm suffering serious consequences for that decision. That's the bad news. The good news is that I can decide how this will affect me as I move forward. I'm not a bad person, but I have made some truly terrible decisions.

Letter from Shamoon Rafiq, Exhibit E.  Therapy, the time to allow for introspection, and the benefits of spiritual books provided to him by friends started to offer Mr. Rafiq clarity into his own psychology and behavior.  With that newfound understanding, he could finally figure out how to be different.

In line with his resolve to gain control over himself, Mr. Rafiq began to implement practical, simple steps in his daily life: First, he starts the day with a meditation and grounds himself by asking himself a standard set of questions borrowed from Seneca, a Stoic philosopher: *"What bad habit did I curb today? How am I better? Were my actions just? How can I improve? What did I do that was unfriendly, unsocial or uncaring?"* Second, Mr. Rafiq has begun journalling as a way of reviewing his actions from the day before. As he writes:

> I have also picked up a new habit of journalling. I wish I'd done it before. Part of journalling is that now you have your actions in black and white. Before this, I only planned for activities that I intended to do. I never reflected on what I'd done. I used to go to a club and spend $20, $30,000 in one night. It's easy to have a great time and not think about it after. But if you write it down the following day, then you realise it was excessive and stupid. Once you've written it down, you are accountable for your actions.

Exhibit E.

The change in Mr. Rafiq was also felt by his family and friends.  His younger sister, Sherry Rafiq, who lives in the Netherlands, has written a moving letter about her brother to the Court.  *See* Sherry Rafiq Letter, Exhibit F.  For Sherry, too, Mr. Rafiq's diagnosis provided a measure of relief.  For the first time, there was an explanation for his destructive behavior, his difficulty, his seemingly irrational conduct, that she had been forced to manage since childhood.  Following his diagnosis and treatment, and as part of his new introspection, fueled by therapy and the spiritual books brought by his friends,

> [t]he tone of his letters changed. The reflections increased, the anger and frustration subsided and more and more coping mechanisms emerged. It was in one of his year-end letters where he reflected on his first year/year and a half in prison and he apologised for the pain he caused us

through those initial letters. It is moments like these I will never forget as they have been so rare throughout our lives. There was remorse, reflection and acknowledgement. Reading turned into studying. Studying philosophy but also studying his own (past) behaviour. He shared his lessons with us, with Donna and even his kids (not knowing whether they would ever read his letters). Yes, there is still pain, his physical health is still deteriorating, the dynamics have changed extremely with his move to the US but there is no more frustration, no anger, no resentment. With the help of Donna, Dr Rama and his studies he has finally come to understand what his drivers and his pitfalls have been. He is (re)discovering himself and for the first time in his life being truly honest with and to himself. And to us.

Exhibit F.

Donna and Lia, the friends in Singapore who were Mr. Rafiq's only visitors, brought him books on philosophy and spirituality. In her letter to the Court, Donna writes:

> For the first time in his life, he actually understood himself. As Omar continued to learn about himself through his reading and reflective journaling, his frustration was replaced; first with interest and determination as he learned and ultimately with a feeling of calm. Finally he realised the cost of cheating, of stealing, of repeatedly doing the wrong thing. He was intent on being a better person to himself and to others.

*See* Letter from Donna Jakins, Exhibit G.

Mr. Rafiq's journey of self-reflection that started with his diagnosis also finally let him acknowledge to himself the truly appalling nature of his crimes. He consistently put his own well-being, his own ego, his own sense of importance above others. For years he had rationalized, defended, and denied the truth of what he was doing – lying, manipulating, and stealing from others to benefit himself. During his time at Changi – and continuing during his incarceration at the MDC – Mr. Rafiq has begun to feel, to feel the pain that he has caused to his victims, to his family, and, ultimately to himself. Finally, at age 50, he has started to confront his demons, search deep within himself, and recognize that he must atone for his destructive conduct.

## **Conclusion**

It is perhaps hard to feel sympathy for Omar Rafiq. For most of his adult life he placed himself above others. He served prison time for similar conduct 20 years ago. He served prison time for similar conduct more recently in Singapore. Why should leniency and compassion be extended to someone like Omar Rafiq? But there are, in fact, substantial reasons for why Mr. Rafiq is deserving of mercy, humanity, and kindness. Mr. Rafiq's criminal conduct did not come out of nowhere. It did not come about because he is a bad,

greedy person by nature.  His conduct has psychological underpinnings that date back to his childhood and youth.  As his sister, Sherry, describes in her letter, "[i[n the first phases of our lives I didn't really consider the option that something was structurally 'wrong' (*e.g.* his neurodiversity) with him. I just felt he was being incredibly difficult and annoying. Especially as he also wasn't very inclined to seek help or even acknowledge that he needed help."  Exhibit F.  To a certain degree, the decisions he made and the life he led were driven, even determined, by his psychological condition.  As Mr. Rafiq explains:

> The noise of the radio station in my head would never cease. Out of the right speaker would come the endless stream or self-aggrandizement, the recitation of your specialness, of how much more open and gifted and brilliant and knowing and misunderstood and humble you are. Out of the left speaker will be the rap songs of self-loathing, the list of all the things you don't do well, all the mistakes you have made over a lifetime, the doubt, the assertion that everything that you touch turns to shit, that you don't do relationships well, that you are in every way a fraud, incapable of selfless love, that you have no talent or insight, and on and on and on.

Letter from Shamoon Omer Rafiq, Exhibit E. He did not experience life as those of us do who are fortunate not to suffer from such conditions.

▆▆▆ does not excuse his crimes, of course.  But it provides a context, an explanation – beyond simply writing Mr. Rafiq off as a bad person.  More importantly even than the diagnosis is what Mr. Rafiq has done with his newfound knowledge.  By all accounts, he has changed.  He has assessed his life and has decided, affirmatively, that he wants to live life as a good person, and to do so must gain control of the "noise," as he describes it.  His two years of introspection, therapy, meditation, and gained self-awareness show not only that he is capable of change, but that he is committed to it.  These actions are worthy of sympathy and compassion.  Even in the context of his crimes, the journey Mr. Rafiq is now on is worthy of recognition and consideration for leniency.

Indeed, Mr. Rafiq has demonstrated the extent to which he has come to terms with his crimes, his conduct, and his efforts to do better.  Rather than engage in a lengthy battle to avoid extradition from Singapore, Mr. Rafiq voluntarily waived extradition immediately after concluding his Singaporean sentence and was sent to New York within three months. Once in the United States, Mr. Rafiq quickly agreed to plead guilty and accept responsibility – only a few weeks after his arrival.  These are the actions of a man who has acknowledged his misconduct and has demonstrated to the Court his willingness to accept the consequences of his actions.

The second basis for leniency is the brutal and inhumane conduct that Mr. Rafiq has been subjected to for over three years.  Mitigation arguments based on conditions of confinement at MDC are commonplace, but that does not make them any less real.  There is a risk of growing numb to arguments of mistreatment, but we cannot ignore that what is happening at MDC falls well outside the realm of normal prison conditions.  And Mr. Rafiq's experience has been extreme, even by what his fellow inmates at the MDC have had

to endure.  For more than three years, he has suffered punishment that we cannot even imagine.  He is not a violent person.  He is not a danger to others.  He is not a disciplinary problem or a flight risk.  He is being punished for a financial crime, and yet he has been treated in ways that we would never subject animals to.  Dostoevsky wrote, "The degree of civilization in a society can be judged by entering its prisons."  By that measure we have a long way to go as a civilized society.  I respectfully urge the Court to acknowledge and consider Mr. Rafiq's traumatic experience of detention, and, like so many of its colleagues have, recognize that experience as a basis for imposing a below-guideline sentence.

Omar Rafiq has committed a serious crime, for which he must face the consequences.  The question for the Court is whether 60 months, in addition to the nearly three years spent at Changi prison for related crimes in Singapore, is necessary.  Mr. Rafiq is a different person now than he was in 2020.  The ordeal he has experienced, and the profound journey of self-discovery that he has embarked on both have clearly shaped his future life.  He will not return to who he was.

For the foreseeable future, Mr. Rafiq will be imprisoned, without visitors.  His life as an inmate in the U.S., far from friends and family, will remain more difficult than for U.S. citizens convicted of similar crimes.[4]  But he will use this time to continue on the path he began to travel on in Singapore.  Once extradited back to the Netherlands, he will embrace, rather than reject, the support of his loving parents and sister.  He will search out a simple productive life, and he will atone for his crimes.  Given these circumstances, a sentence below the statutory maximum sentence of 60 months would be reasonable and just.  It would be sufficient, but not greater than necessary and would satisfy the aims of sentencing at 18 U.S.C. § 3553(a).

Thank you for your consideration.

Respectfully submitted,

/s/

Florian Miedel
*Attorney for Shamoon Rafiq*

cc: all Parties of record (*via* ECF)

---

[4] The disadvantages of being a non-citizen inmate in the BOP are considerable.  As a non-citizen, Mr. Rafiq is not eligible for early release to half-way house.  He is not eligible for certain programs that permit a reduction of the sentence, such as the RDAP program.  He is not eligible to be incarcerated at a camp like he would be if he were a citizen.  Worst of all, rather than being reduced, his sentence will actually be extended because once he completes his prison term, rather than being released, he will be transferred to ICE custody where he will remain for an indeterminate period of time before being deported.  All of these factors make Mr. Rafiq's incarceration harsher than it would be for a similarly situated U.S. citizen.  Considering the excessively harsh conditions of confinement Mr. Rafiq has already endured, combined with the disproportionately difficult sentence he has yet to serve, I respectfully urge the Court to impose a sentence below the guideline range.